Opinion by
Head, J.,
On April 21, 1898, as the result of a suggestion filed by the attorney general, a decree was entered by the court of common pleas of Dauphin county, finding that the Guarantors’ Finance Company had become insolvent, ordering that it be dissolved and its effects distributed and appointing receivers to wind up its business. On December 22, 1898, the same court appointed the same persons receivers for the Guarantors’ Liability Indemnity Company. After the accounts of the receivers had been presented and confirmed, auditors were appointed to make distribution. From their report it appears *549 that the principal fund for distribution, and the only one with which we are called upon to deal, arose from the sale of securities deposited by the Guarantors’ Liability Company with the insurance commissioner of Pennsylvania, under the provisions of the Act of April 6, 1868, P. L. 65. It is agreed that these securities were, under the terms of the act, held “in trust and for the benefit of all its (the depositing company’s) policy holders.” As a consequence no creditor of such company except a policy holder with a claim fcased upon his policy, could be permitted to share in a distribution of this particular fund.
The Union Traction Company, the present appellant, appeared before the auditors and made claim to the allowance, out of the fund mentioned, of a pro rata share based on an alleged policy liability of nearly $200,000. No policies held by claimant were produced or presented, nor, except as hereinafter indicated, was any evidence offered of the existence of such policies then in force, or of the nature, extent or amount of any claims due and owing to the appellant, for the payment of which the insured, under the terms and conditions of such policies, had, prior to the decree of insolvency, become liable.
There were presented, however, two written agreements, one between appellant and the indemnity company, dated January 18, 1897; the other between the appellant, of the one part, and both the indemnity company and the finance company, of the other part, dated January 14, 1898. From the recitals of fact contained in these agreements, the appellant contended, it appeared, prima facie at least if not conclusively, that it had been the lawful holder of certain policies which had never been canceled or surrendered; that under the terms and conditions thereof the insurer had become liable for the payment of large sums; that the extent and amount of such liability had been amicably adjusted and liquidated and payment promised and apparently provided for; but that, such payment not having in fact been made, the liability remained seated upon the policies and the right of the claimant to participate, in the trust fund for policy holders, was thus established.
*550 To the allowance of this claim objections were made by the other policy holders, whose policies and claims thereunder had been proven in the usual way. The nature of the objections, largely drawn from the agreement itself, and the force of the supporting argument, may be thus summarized. The avowed purpose of the agreement of January, 1897, and its legal effect as well, was to destroy the relation of insurer and insured which had become unsatisfactory to both parties; to procure ,a compromise and settlement of a number of claims asserted by the indemnity company against the appellant; to take out of the hands of the former and restore to the latter the management and control of the settlement or trial of claims against the traction company, based on the negligence of its servants; to fix a definite sum which the indemnity company should pay, or secure in a satisfactory manner, to close the transaction. That this agreement had been substantially executed by the indemnity company which had given its obligation, for the sum, payable at the time, agreed on; had released its claims and surrendered control as provided; had stripped its treasury of practically all of its assets — save the securities beyond its control which produced the present fund — in order to collaterally secure, to the satisfaction of appellant, the payment of its bond. That large sums had been secured by the use of these collaterals, which had been accepted and retained as a satisfactory compliance with the agreement; that the latter never contemplated that appellant could, at the same time, enforce the obligations of its policies and enjoy the fruits of the agreement, the purpose of which was to buy the surrender of the policies; that it had never undertaken to rescind or repudiate the agreement, as, in one event only, it reserved the right to do, and could not, after the insolvency, do so and restore the former relation of insurer and policy holder, to the detriment of other policy holders, and certainly not without returning the securities it had received in execution of the agreement.
The learned auditors adopted the theory thus advanced of the true construction and legal effect of the agreement of January, 1897, and denied the right of the appellant to partici *551 pate in the trust fund. Exceptions were filed to their report, but they were dismissed by the Dauphin county court in an opinion filed by its president judge. We have then this appeal.
A careful study of the agreement itself and of the able briefs presented on both sides leads us all to the conclusion that the position adopted by the auditors and the learned court below is impregnable. That agreement was, in our judgment, more, very much more, than an amicable liquidation, between insurer and insured, of a liability that had arisen under a policy or policies held by the latter. The unanswerable proof of this is found in the language and terms of the instrument itself. Let us glance but briefly at some of the things that undeniably were accomplished by its execution.
It declares that the indemnity company had entered into a contract, known as Contract No. 1, with the Philadelphia Traction Company “agreeing to indemnify and save harmless the said company of and from all claims and demands of every sort and kind whatever arising from accidents happening in the construction, maintenance and operation” of its railway lines; that “certain parties interested in the management and success of Guarantors entered into a bond, in the maximum sum of $300,000.00, guaranteeing the faithful performance of said Contract No. 1;” that these parties were desirous of being released which release “ Union is willing to procure in consideration of the substitution of other securities,” therein-after provided for.
It further declared that “questions have arisen between the parties respecting certain alleged breaches of (another) Contract No. 2, by failure to keep mo tormén under bond, the Guarantors have claimed to recover certain sums of money as damages for said alleged breaches and to be thereby relieved from obligations with respect to certain of the accidents.”
It stated that “a large number of claims and suits covered by said contracts of insurance still remain pending and undetermined and the damages payable therein by the insured and for which the insurer would be liable have not been and cannot be liquidated and determined.” The management and *552 control of all of tírese were in the hands of the indemnity-company. These were some of the perplexing conditions, filled with weighty responsibilities to both parties and pregnant with prospects of future litigation between them, that stimulated them to abolish their existing relation and substitute something else in its stead as the result of which, among other things, guarantors would have “its liability under all of said contracts of insurance liquidated, determined and discharged, and Union to have full control of its own accident business.”
After further reciting that $200,000 was the sum agreed on to be paid by guarantors, it is declared that “it is not convenient for Guarantors to pay said amount in cash upon the execution of this agreement, but it is prepared to furnish security for said payment satisfactory to Union,” but “it is impossible for Union to make an immediate examination of the mortgages included among said securities.” The long list of securities to be turned over, with the bond of $400,000 is then enumerated, after which we find this provision:
“E. The transfer of all said securities and the assignment of all said mortgages to be made simultaneously with the execution of this agreement and upon receipt of the same. Union is to satisfy or cause to be satisfied the said bond attached to Contract No. 1 and hereinbefore referred to, but the said contracts and policies of insurance are not to be surrendered or canceled until Union is satisfied that all of the mortgages hereinbefore referred to are in the condition herein described which is warranted by the Guarantors, and as soon as the mortgages are found to be as alleged all said policies and contracts of insurance shall be surrendered and canceled.
. “E. In case any of the mortgages upon investigation prove not to be as herein warranted by Guarantors then Guarantors shall have ten days within which to substitute cash or other security satisfactory to Union therefor, and if Guarantors thus •fail to satisfy Union within ten days after such notice, then the liquidation of the liability under said policies and contracts of insurance, as hereinbefore provided for (to-wit, $200,000) shall be null and void,” etc.
It is thus clear that the execution and delivery of the in *553 demnity company’s bond and the transfer of the other enumerated securities was to produce the same effect precisely as would have followed, had the $200,000 been paid in cash: to wit: the surrender and cancellation of all policies and contracts. But it further seems clear that if some particular mortgage was not or could not, by the efforts of guarantors, be made a first lién, Union could nevertheless retain it if satisfied it possessed schedule value, or that it was better than anything else that could be secured. And if it was dissatisfied then clause “F,” above quoted, came into operation. The agreement was not to be destroyed by the failure of a mortgage to come up to representations unless notice was given to substitute cash or another satisfactory security therefor, and a ten days’ failure followed. If then, by the exercise of the optional right reserved to Union, any part of the agreement was to be destroyed, it is expressly declared to be “the agreed on liquidation of $200,000.00.”
Now the agreement was signed, presumably the securities were turned over contemporaneously, the mortgages were assigned, the individual sureties on the bond attached to Contract No. 1 were discharged and the bond satisfied; the claims of guarantors under Contract No. 2 were extinguished and abandoned; Union resumed full control of its accident business and retained it; it accepted the securities and mortgages and held them without any complaint that anyone was not satisfactory or giving to guarantors notice or opportunity “to substitute cash or other security satisfactory to Union therefor;” and it appears now standing upon and claiming under that liquidation which, by its own terms, was to “be null and void,” if the securities turned over with the bond were not accepted as satisfactory. If they were not satisfactory, and the liquidation became “null and void,” appellant had no standing before the auditors until it at least presented its policies and proved its claims thereunder like other policy holders. If the securities were acceptable — notwithstanding the fact that one of the mortgages proved not to be a first •lien — and the agreed on liquidated damages, stood, then the appellant should have complied with the law it made for itself: *554 “And as soon as the mortgages are found to be as alleged all said policies and contracts of insurance shall be surrendered and cancelled.”
To further elaborate our reasons for the conclusion .we have reached would serve no good purpose. We think we have sufficiently indicated at least some of the obstacles, to our minds insurmountable, which stand in the way of the appellant’s effort to establish itself in the position of a policy holder with a right to share in the fund reserved for creditors of that class. Its right, as to anything that may yet be due on its bond, to share in the fund derived from the general assets of its debtor is not questioned and to that we think it must resort. The assignments of error are dismissed.
Decree affirmed.